**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TIMOTHY COBLE,** | : | |
| | : | |
| **Plaintiff** | : | **Civil No. 3:11-CV-1276** |
| | : | |
| **v.** | : | **(Judge Caputo)** |
| | : | |
| **DAMITER, et al.,** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

In this action, the plaintiff Timothy Coble, a former state prisoner in the custody of the Pennsylvania Department of Corrections, has brought suit against seven officials at the State Correctional Institution (SCI) at Frackville, alleging that these officials were deliberately indifferent to a serious risk of physical harm that Coble faced from another inmate with whom Coble was previously housed, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.[1]  Coble claims that on June 28, 2010, he was stabbed three times by the inmate whom Coble had previously identified as a threat to numerous prison officials

---

[1]  The defendants in this action are Peter Damiter, the Superintendent's Assistant at SCI-Frackville; Deputy Warden Kephardt; Deputy Warden Kevalchick; Unit Manager Gary Rosato; Sergeant David Sackett; Unit Manager Russel Sheuren; and Lieutenant Anthony Wickersham.

on multiple occasions.  On March 16, 2012, Coble brought this lawsuit, alleging that

the deliberate indifference of SCI-Frackville officials permitted the assault to occur.

This matter now comes before the Court on defendants' motion for summary

judgment on Coble's claims that defendants violated the Eighth and Fourteenth

Amendments by failing to protect Coble from a known threat of harm posed by his

former cellmate, Gerald Walsh.  (Doc. 20.)  The motion is fully briefed and has been

referred to the undersigned for purposes of preparing a report and recommended

disposition of the motion.   For the reasons that follow, we recommend that

defendants' motion be granted in part and denied in part.

## II.   <u>FACTUAL BACKGROUND</u>[2]

The plaintiff in this case is Timothy Coble, a former state prisoner previously

in the custody of the Pennsylvania Department of Corrections, who during the time

---

[2]  The factual background is taken from the parties' competing statements of
material fact.  (Docs. 21 and 25, Ex. 1.)  Many of the facts asserted to be relevant
to the pending motion are undisputed.  In those instances where the plaintiff has
disputed a fact asserted by the defendants, we find that the plaintiff has adequately
supported the dispute with evidence.  (Doc. 25, Ex. 1 and Doc. 24, Ex. 1,
Declaration of Timothy Coble.)  In accordance with the standard for adjudicating
motions for summary judgment, where a fact has been genuinely placed in dispute,
we have construed the fact in the light most favorable to the plaintiff as the non-
moving party.  Although we have construed the facts in the light most favorable to
Coble for purposes of providing a factual narrative in this report, we note that
those facts that have been placed in dispute have not been conclusively
determined, and must await resolution at trial.

he was in custody was housed on multiple occasions at SCI-Frackville.  In 2006, Coble was housed at SCI-Frackville in a cell with another inmate named Gerald Walsh.  According to Coble, he and Walsh had a falling out after Coble resisted Walsh's sexual advances and attempts to extort money from him.  Coble claims that Walsh filed a false report in retaliation against Coble with prison officials.  Coble claims that he was subsequently placed in solitary confinement as a result of this false report, but was thereafter cleared of the  charges.  In November 2007, Coble was released from prison.

In February 2009, Coble was returned to custody for violating the conditions of his parole.  Coble was housed at SCI-Frackville from February 18, 2009, until August 3, 2010, to serve time on his parole violation.

According to Coble, when he arrived at SCI-Frackville in February 2009, he was interviewed by prison security officials, who inquired about any enemies that Coble had within the state prison system.  (Doc. 24, Ex. 1, Declaration of Timothy Coble, ¶ 8.)  Coble informed the officials about his prior problems with Walsh, and Coble asserts that prison officials told him during this interview that a separation order had been entered with respect to the two inmates.  (Id. ¶¶ 9-10.)

After being returned to SCI-Frackville, from February 18, 2009, until June 3, 2009, Coble was housed in the A Unit at the prison.  (Doc. 21 ¶ 1.)  Thereafter, from

June 3, 2009, until July 29, 2009, Coble was assigned to the C Unit.  (Id. ¶ 2.)  Both of these units are general population housing blocks at SCI-Frackville.  (Id. ¶ 3.)  During the same time period, Gerald Walsh was also assigned to general population housing units at the prison.  (Id. ¶ 4.)  Inmates in the general population housing units at SCI-Frackville interact with one another in the dining areas, hallways, and exercise yard.  (Id. ¶ 5.)

Coble thereafter moved through other general population units at the prison.  From July 29, 2009, until February 23, 2010, Coble was assigned to D Unit; and from February 23, 2010, until June 15, 2010, Coble was housed in B Unit.  At this point, Coble requested reassignment to D Unit at the prison, also known as "the mods," so that he could work at an outside job.  The request was granted, and Coble was assigned to D Unit between June 15, 2010, and June 24, 2010.  (Id. ¶ 8; Coble Decl. ¶ 18.)

While housed in the mods on D Unit, Coble was assigned to work in the prison kitchen.  (Coble Decl. ¶ 18.)  While working in the kitchen, he injured his back and was unable to continue working.[3]  (Id. ¶ 19.)  At this time, Coble maintains that he

---

[3] Defendants appear to dispute Coble's claim that he left his job due to injury, asserting that Coble "did not want to work and wanted to move back to general population."  (Doc. 21 ¶ 10)  This factual dispute is not relevant to the pending motion.

was informed he had to work in order to remain housed on D Unit, and because he was unable to work he requested a transfer back to A Unit in the prison. (Id. ¶¶ 20-21.)

Coble's transfer request was not approved, and he was instead transferred from D Unit to C Unit on June 24, 2010. (Doc. 21, ¶ 12.) Gerald Walsh was also housed on C Unit at this time. According to Coble, he was transferred to C Unit even after he verbally informed SCI-Frackville Unit Manager Russel Scheuren that there had been a separation order in place between Coble and Gerald Walsh, and that Walsh was reportedly paying inmates to assault him.[4] (Coble Decl. ¶¶ 22-24.)

Immediately after arriving at C Unit, Coble took steps to protect himself from Walsh by informing Unit Manager Rosato that there had been a separation order in effect between Coble and Walsh. (Id. ¶ 26.) Coble told Unit Manager Rosato that Walsh was paying inmates to assault him and that Coble felt neither safe nor

---

[4] This factual issue is squarely in dispute. As noted, Coble claims he informed Unit Manager Scheuren about his concerns with Walsh and the separation order that Coble claims had been in effect between the two inmates. In sharp contrast, Scheuren maintains that Coble did not notify Scheuren about any problems between Coble and Walsh, and Scheuren claims he was unaware of any threat to Coble's safety "at that time". (Doc. 21, Ex. A, Declaration of Russel Scheuren at ¶ 19.) Scheuren also contends that before transferring prisoners he routinely consults prison records to determine whether any separation orders preclude the housing assignment, and that "no separation order on record at the time prevented Coble's transfer from D Unit to C Unit." (Id. at ¶ 21; Doc. 21, Ex. G, Declaration of Timothy Clark at ¶ 8.)

comfortable being on C Unit with Walsh, but instead considered himself to be in serious danger. (Id. ¶ 27; Doc. 21, at ¶ 17.) Coble conceded that he had not had any personal contact with Walsh since being returned to SCI-Frackville in 2009. (Doc. 21, ¶ 18.) In spite of these concerns and having brought these safety issues to the attention of two unit managers at the prison, Coble was assigned to C Unit, with Unit Manager Rosato informing Coble that "he would speak to Mr. Walsh, and there wouldn't be any problems on his housing unit." (Coble Decl. ¶ 28.)

Also on June 24, 2010, the day he was placed in C Unit, Coble sent a formal Inmate Request to Staff to Assistant Superintendent Peter Damiter, informing him that Walsh was threatening to harm Coble. (Coble Decl. ¶ 29.) In addition, on the night of June 24, 2010, Coble spoke with the lieutenant on duty, Anthony Wickersham, to inform him about Walsh's threats. (Id. ¶ 30.) According to Coble, Wickersham responded by explaining that he had no "jurisdiction" over the issue, but assured Coble that he would alert the Security Captain to Coble's concerns. (Id. ¶¶ 31-32.) Coble claims that Lieutenant Wickersham took Coble's name and prisoner identification number, and assured him that personnel from the Security Office would speak with him about the matter. (Id. ¶ 33.) Despite this assurance, Coble claims that no one from the Security Office ever followed up with him. (Id. ¶ 34.)

Apparently in his own effort to follow up on Coble's concerns, Unit Manager Rosato actually informed inmate Walsh about Coble's allegations, and Rosato asked Walsh whether there was any problem between the inmates. Walsh responded by telling Rosato that he had no problem with Coble, and Walsh denied planning to have other inmates assault Coble. (Doc. 21 ¶ 20 and Ex. E, Decl. of Gary Rosato at ¶ 6.)

Rosato also notified the Security Office at SCI-Frackville of the issue in an email sent at 10:10 a.m. on June 24, 2010. (Doc. 21 ¶ 21 and Ex. E, Rosato Decl. at ¶ 7.) Defendants claim that the Security Office had no record that Coble had ever reported any problems with Walsh "at any point during Coble's incarceration," (Doc. 21 ¶ 22), whereas Coble maintains that he identified Walsh as an enemy during his intake interview at SCI-Frackview in February 2009, (Coble Decl. ¶ 25.) Captain Timothy Clark submitted a declaration in which he maintains that if Coble had identified enemies during his intake interview, he "would have been separated from those potential threats to his safety." (Doc. 21 ¶ 25 and Ex. G, Clark Decl. ¶ 9.) In contrast to Clark's representation, Coble has sworn that during his intake interview, he was informed that a separation order was in place between him and Gerald Walsh. (Coble Decl. ¶¶ 9-10.)

Although Captain Clark was aware that Gerald Walsh had told Unit Manager Rosato that he had no intention of harming Coble, Clark nonetheless assigned an

officer to investigate.  (Doc. 21 ¶ 26 and Ex. G, Clark Decl. ¶ 10.)  However, the officer that Clark assigned to investigate was out of the institution at the time of the assignment, and did not return until June 28, 2010, or four days after Coble had been placed in C Unit along with Gerald Walsh.  (Doc. 21 ¶ 27.)

 Peter Damiter responded to Coble's Inmate Request to Staff on June 27, 2010, in which Damiter assured Coble that he would "look into your issue."  (Coble Decl. ¶ 35.)  Coble claims that on June 27, 2010, he immediately followed up by sending a second Inmate Request to Staff to Damiter regarding threats from Walsh, and he sent similar requests to Deputy Wardens Kephardt and Kevalchick.  (Id. ¶ 36.)

 In his declaration, Coble maintains that he informed defendant Damiter on multiple occasions regarding his concerns that he was going to be harmed by Walsh, including during face-to-face meetings during which Coble claims Damiter took notes and promised to prepare a report, and in two written Inmate Requests to Staff.  (Coble Decl. ¶ 34.)  In contrast, Damiter acknowledges that he received "an Inmate Request Form . . . in which Coble made assertions relating to inmate Gerald Walsh," (Doc. 21 ¶ 31 and Ex. I, Declaration of Peter Damiter ¶ 4.), but contends he "never had any information about a threat to inmate Coble's safety before Coble was assaulted on June 28, 2010."  (Doc. 21 ¶ 34 and Ex. I, Damiter Decl. ¶ 7.)

8

Despite having reportedly notified multiple prison officials and security personnel at different times throughout 2009 and 2010 regarding the need to be kept separated from Gerald Walsh, and despite his claim that some prison officials had informed him that there was a separation order on file between him and Walsh, on the evening of June 28, 2010, Walsh attacked Coble.  When Coble returned to Unit C from the exercise yard, Walsh slashed him with a homemade knife, cutting Coble's right ear and cheek.  (Coble Decl. ¶¶ 37-38.)  Coble fled from Walsh, eventually reaching B Wing of C Unit, where he informed Corrections Officer Bardo that he needed medical assistance.  (Id. ¶ 39.)  Officer Bardo pulled Coble into the control bubble, and informed Sergeant Sackett of the situation, who left to get help.  (Id. ¶ 40; Doc. 21 ¶ 41.)

Coble was taken to Saint Catherine Medical Center Fountain Springs for treatment of three lacerations suffered during Walsh's attack, including one on the right side of his neck, one on his right ear, and one on his left cheek.  (Coble Decl. ¶ 41.) Upon his return to SCI-Frackville, Coble claims that he received Superintendent Assistant Damiter's response to Coble's second Inmate Request to Staff, in which Damiter informed him that "I'm going to forward your request for security to review. Let's see what there [sic] thoughts are on this."  (Id. ¶ 42.)

9

## III.   **PROCEDURAL BACKGROUND**

Plaintiff commenced this lawsuit on March 22, 2011, by filing a complaint with the United States District Court for the Eastern District of Pennsylvania.  (Doc. 3.)  The action was thereafter transferred to the Middle District of Pennsylvania on July 8, 2011, where venue properly lay given the fact that Coble was at this time living in Bellefonte, Pennsylvania, and the incidents alleged in the complaint occurred within this district.  (Doc. 9.)  Defendants filed an answer to the complaint on August 3, 2011.  (Doc. 12.)

Following discovery, on April 26, 2012, defendants moved for summary judgment.  (Doc. 20.)  Defendants filed a statement of material facts and a brief in support of the motion on the same day.  (Docs. 21, 22.)  Plaintiff filed a brief in opposition to the motion on May 18, 2012, and a *nunc pro tunc* answer to defendants' statement of material facts on May 23, 2012.  (Docs. 24, 26.)  Defendants' declined to file a reply brief in further support of their motion.

## III.   **STANDARD OF REVIEW**

Rule 56(a) of the Federal Rules of Civil Procedure provides as follows:

A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court

should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  For purposes of Rule 56, a fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.  Haybarger v. Laurence Cnty. Adult Prob. & Parole, 667 F.3d 408, 412 (3d Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  For an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Id. (quoting Anderson, 477 U.S. at 248-49).

Accordingly, in support of a motion for summary judgment, the moving party must show that if the evidence of record were reduced to admissible evidence in court, it would be insufficient to allow the non-moving party to carry its burden of proof.  See Celotex v. Catrett, 477 U.S. 317, 323 (1986).  Provided the moving party has satisfied this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007).  Instead, if the moving party has carried its burden, the non-moving party must then respond by identifying specific facts, supported by evidence, which show a genuine issue for trial, and may not rely upon the allegations or denials of its

pleadings.  See Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007); see also Fed. R.

Civ. P. 56(c).

In adjudicating the motion, the court must view the evidence presented in the

light most favorable to the opposing party, Anderson, 477 U.S. at 255, and draw all

reasonable inferences in the light most favorable to the non-moving party, Big Apple

BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

Where the non-moving party's evidence contradicts the movant's, then the non-

movant's must be taken as true.  Id.   Additionally, the court is not to decide whether

the evidence unquestionably favors one side or the other, or to make credibility

determinations, but instead must decide whether a fair-minded jury could return a

verdict for the plaintiff on the evidence presented.  Id. at 252; see also Big Apple

BMW, 974 F.2d at 1363.   In reaching this determination, the Third Circuit has

instructed that:

> To raise a genuine issue of material fact . . . the opponent need not
> match, item for item, each piece of evidence proffered by the movant.
> In practical terms, if the opponent has exceeded the "mere scintilla"
> threshold and has offered a genuine issue of material fact, then the court
> cannot credit the movant's version of events against the opponent, even
> if the quantity of the movant's evidence far outweighs that of its
> opponent.  It thus remains the province of the factfinder to ascertain the
> believability and weight of the evidence.

Id. In contrast, "[w]here the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party, there is no genuine issue for trial." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (internal quotation marks omitted); <u>NAACP v. North Hudson Reg'l Fire & Rescue</u>, 665 F.3d 464, 476 (3d Cir. 2011).

## IV.    **DISCUSSION**

Defendants argue that they are entitled to summary judgment on plaintiff's claim that they violated the Eighth Amendment through deliberate indifference to a serious threat to his safety, arguing that there are no facts to show that any of the defendants knew of an impending threat to Coble's safety and ignored that threat. Defendants also argue that defendants Kephardt and Kevalchick are entitled to dismissal of plaintiff's claims against them because Coble has not made any allegations to show that these supervisory officials had any involvement in the incidents alleged in complaint.  Finally, defendants argue that they are entitled to summary judgment on plaintiff's claim under the Fourteenth Amendment, since this claim is duplicative of the Eighth Amendment claim, and should not be permitted to proceed as a freestanding claim since the alleged conduct complained of is specifically covered by the Eighth Amendment.

### A.   Defendants Kephardt and Kevalchick are Entitled to Summary Judgment

As a threshold matter, we agree that defendants Kephardt and Kevalchick are entitled to summary judgment in their favor because plaintiff did not include any factual allegations against either of these supervisory defendants in the body of the complaint.  Instead, plaintiff named these defendants in the caption of the complaint, but included no factual averments to suggest that either supervisor took any action, or failed to take any action, with respect to ensuring his safety from Gerald Walsh. Instead, it appears that plaintiff is merely seeking to include these individuals as defendants due to their positions as supervisors at SCI-Frackville.

At the outset, it is clear that a claim of a constitutional deprivation cannot be premised merely on the fact that the named defendant was the prison warden, or a prison supervisor, when the incidents set forth in the complaint occurred.  Quite the contrary, to state a constitutional tort claim the plaintiff must show that the supervisory defendants actively deprived him of a right secured by the Constitution. Morse v. Lower Merion School Dist., 132 F.3d 902 (3d Cir. 1997); see also Maine v.Thiboutot, 448 U.S. 1 (1980).  Constitutional tort liability is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or of actual knowledge and acquiescence in

the challenged practice.   Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir.

1997).

> In particular, with respect to prison supervisors it is well-established that:

> "A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988).

Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005).

> As the Supreme Court has observed:

> Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. . . . See Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983); see also Dunlop v. Munroe, 7 Cranch 242, 269, 3 L.Ed. 329 (1812) (a federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); Robertson v. Sichel, 127 U.S. 507, 515-516, 8 S.Ct. 1286, 3 L.Ed. 203 (1888) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties"). Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).

Applying these benchmarks, courts have frequently held that, in the absence of evidence of supervisory knowledge and approval of subordinates' actions, a plaintiff may not maintain an action against supervisors based upon the misdeeds of their subordinates. O'Connell v. Sobina, No. 06-238, 2008 WL 144199, * 21 (W.D. Pa. Jan. 11, 2008); Neuburger v. Thompson, 305 F. Supp. 2d 521, 535 (W.D. Pa. 2004). Rather, "[p]ersonal involvement must be alleged and is only present where the supervisor directed the actions of supervisees or actually knew of the actions and acquiesced in them. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988)." Jetter v. Beard, 183 F. App'x 178, 181 (3d Cir. 2006).

In this case, Coble appears to have identified Kephardt and Kevalchick as defendants solely due to their supervisory role as Deputy Wardens at SCI-Frackville. The complaint contains no factual averments regarding these supervisory officials' direct involvement or acquiescence in the events set forth in the complaint beyond a reference to their supervisory status. This is a style of pleading which is plainly inadequate to state a claim against a prison supervisor and compels dismissal of this defendant. Hudson v. City of McKeesport, 241 F. App'x 519 (3d Cir. 2007)(affirming dismissal of defendant who was only named in caption of case).

We recognize that in his declaration offered in opposition to defendants' motion for summary judgment Coble claims to have submitted an Inmate Request to

16

Staff to both defendants Kephardt and Kevalchick on June 27, 2010, presumably regarding Gerald Walsh.  (Coble Decl. ¶ 36.)  Nevertheless, plaintiff's complaint – the pleading alleging the legal violations at issue in this case – contains no factual allegations against either of these individual supervisors, and we find that a single sentence attesting generally to an Inmate Request form submitted to these two defendants is, at this point in the litigation, insufficient either to create a new claim against these individual supervisors, or to permit a claim to go forward against these defendants where no claim ever was properly alleged.  Accordingly, we will recommend that summary judgment be granted with respect to defendants Kephardt and Kevalchick.[5]

---

[5]We further note that Coble's most recent allegations regarding these defendants  simply assert that he first sent a written communication regarding inmate Walsh to defendants Kephardt and Kevalchick on June 27, 2010, mere hours before Coble was assaulted by Walsh on June 28, 2010. In this setting, corrections officials may be held liable under the Eighth Amendment only when the inmate-plaintiff "presents evidence showing that a substantial risk of inmate attacks was *longstanding, pervasive, well-documented, or expressly noted by prison officials in the past,* and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk *and thus must have known about it*, then such evidence would permit a trier of fact to find that the defendant-official had actual knowledge of the risk." Farmer, 511 U.S. at 842-43 (emphasis added). Here, where Coble himself now acknowledges that he only contacted defendants Kephardt and Kevalchick on one occasion immediately prior to the assault by inmate Walsh, we cannot find that Coble has carried his burden of proof as to these defendants of showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by these prison officials in the past.

**B.**   **With the Exception of Plaintiff's Claims Against Sergeant Sackett, Disputed Issues of Fact Exist With Respect to Coble's Eighth Amendment Claims Against the Remaining Defendants, and Summary Judgment is Therefore Inappropriate**

The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment.  See U.S. Const. amend. VIII.  "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."   Farmer v. Brennan, 511 U.S. 825, 828-29. Therefore, a prison official has a duty to protect inmates from serious risks of harm of which the prison official is aware.  Id. at 833.  However, in order to constitute "deliberate indifference" under the Eighth Amendment, the prison official who is alleged to have failed to protect an inmate must have had subjective knowledge of the risk of serious harm, and he must nevertheless have failed to respond reasonably to the known risk.  Id. at 837-38.  Thus, proof of a culpable subjective intent is a critical component of any Eighth Amendment claim in a prison setting.

Courts thus recognize that prison officials have an affirmative obligation to protect inmates from abuse at the hands of fellow prisoners.  However, as is the case generally with Eighth Amendment claims, proof of a culpable subjective intent is a critical component of an Eighth Amendment failure-to-protect claim.  The leading case in the Third Circuit addressing deliberate indifference in this prison context is

found in <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120 (3d Cir. 2001).  In <u>Beers-Capitol,</u> the Third Circuit explained the basic requirements of a claim brought against a prison official under the Eighth Amendment as follows:

> An Eighth Amendment claim against a prison official must meet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind."

<u>Id.</u> at 125 (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994)).  Furthermore, in cases involving prison safety or prison conditions, the relevant state of mind "is one of 'deliberate indifference' to inmate health or safety."  <u>Id.</u>

This deliberate indifference standard "is a subjective standard under <u>Farmer</u> – the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety."  <u>Id.</u>  Thus, " '[d]eliberate indifference can be shown when a prison official *knows of and disregards* an excessive risk to inmate health or safety') <u>Hamilton v. Leavy</u>, 117 F.3d 742, 747 (3d Cir. 1997)) (emphasis added). Accordingly, "to survive summary judgment on an Eighth Amendment claim asserted under 42 U.S.C. § 1983, a plaintiff is required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." <u>Davis v. Williams</u>, 354 F. App'x 603, 605-606 (3d Cir. 2009).

As explained in <u>Beers-Capitol</u>, in Eighth Amendment cases based on allegations of deliberate indifference on the part of prison officials or other supervisory defendants, the Supreme Court has "rejected an objective test for deliberate indifference; instead it looked to what the prison official actually knew rather than what a reasonable official in his position would have known." <u>Id.</u> at 131. Specifically, the Supreme Court "held that 'a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety.'" <u>Id.</u> (quoting <u>Farmer</u>, 511 U.S. at 837).  This requirement of actual knowledge on the part of supervisory officials "means that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" <u>Id.</u> (quoting <u>Farmer</u>, 511 U.S. at 837).

At the same time, this subjective standard does not insulate officials from liability where such officials choose to remain deliberately indifferent to an excessive or substantial or serious risk of harm to inmates.  The Supreme Court explained:

> We are no more persuaded by petitioner's argument that, without an objective test for deliberate indifference, prison officials will be free to ignore obvious dangers to inmates.  Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm would actually befall an inmate; it is

enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.

Farmer, 511 U.S. at 842.   The Supreme Court also noted that a supervisory defendant's knowledge of a risk may be proved through circumstantial evidence, so that "a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id.

The appellate courts recognize that a mere generalized knowledge that prisons are dangerous places does not give rise to an Eighth Amendment claim. See, e.g., Jones v. Beard, 145 F. App'x 743 (3d Cir. 2005).  Instead, the Court of Appeals has interpreted Farmer to signal that a plaintiff could make out a deliberate indifference case by showing that prison officials simply were aware of a general risk to inmates in the plaintiff's situation.  However, in order to show deliberate indifference in this fashion, a plaintiff would need to come forward with evidence showing a substantial basis for demonstrating that a prison official was deliberately indifferent in the face of information that presented a substantial risk to inmate safety.  As the Supreme Court has observed in this context: "If an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was *longstanding, pervasive, well-documented, or expressly noted by prison officials in the past,* and the circumstances suggest that the defendant-official being sued had been exposed to

information concerning the risk *and thus must have known about it*, then such evidence would permit a trier of fact to find that the defendant-official had actual knowledge of the risk." <u>Farmer</u>, 511 U.S. at 842-43 (emphasis added).  Likewise, a prison official will not escape liability in a failure-to-protect claim "by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." <u>Id.</u> at 843.

Applying these benchmarks to this case, we conclude that disputed issues of material fact exist with respect to all remaining defendants other than Sergeant Sackett, whom plaintiff has conceded should be dismissed from this action.[6] Defendants contend that after he was first returned to SCI-Frackville, "Coble did not indicate that Walsh was an enemy or a threat to his safety and no separation order precluded Coble from being housed in the same vicinity as Walsh." (Doc. 22, at 6.) This assertion stands in pointed contrast to Coble's sworn declaration, in which he states that when questioned about any enemies he might have in the state prison system, he identified Walsh, and was informed by prison staff that there was a

---

[6] In his brief, Coble argues that a "fact-finder could infer that all the defendants, save defendant Sackett, had actual knowledge of the threat to Plaintiff." (Doc. 24, at 5.)  We similarly find that there is no evidence in the record to suggest that Sergeant Sackett knew of the threat to Coble, or did anything other than to provide aid to Coble after Walsh attacked him.

separation order in place.  (Coble Decl. ¶¶ 8-10.)  This factual dispute is incapable of being resolved on defendants' motion alone, and should await trial.

Moreover, there are other factual issues that are either in dispute, or which bear upon whether defendants' knew of a threat to Coble's safety and, if so, whether they reacted reasonably to that threat.  First, as noted, there is a disputed issue of fact as to whether prison officials knew of a danger or threat stemming from the time when Coble was first celled with Walsh, and whether they knew of this threat when Coble returned to the prison on parole violations in 2009.  Coble also claims that he made the defendants aware on multiple occasions regarding the threats that Walsh was making against him, and that these officials told Coble that they would follow up on his concerns.  Coble contends that this process continued even after June 24, 2010, when prison officials made the decision to move Coble into C Unit in spite of his repeated expressions of concern for his safety, and even after prison officials evidently felt there was sufficient reason to commence an investigation into whether Coble was in danger.  Apparently this investigation was ordered, but did not commence, for several days after Coble was placed in proximity to Walsh, and after Walsh had acted on an opportunity to slash Coble multiple times with a homemade knife.

Given the multiple disputes that exist with respect to what prison officials knew regarding a danger that Walsh posed to Coble, and about whether their responses to this danger were reasonable, we conclude that summary judgment on plaintiff's failure-to-protect claims against all defendants other than Kephardt, Kevalchick, and Sackett should be resolved at trial and not on summary judgment.

### C.    Coble's Claim for Violations of the Fourteenth Amendment Should Be Dismissed Because These Claims Are Specifically Covered By the Eighth Amendment

Plaintiff has alleged that defendants deprived him of his Fourteenth Amendment substantive due process rights and his right under the Eighth Amendment to be free from cruel and unusual punishment through defendants' failure to protect him from a known danger.  Defendants argue that plaintiff should not be permitted to maintain a claim for a substantive due process violation under the Fourteenth Amendment since that claim is predicated on the same allegations that prison officials failed to protect him, and such claims are specifically covered by the Eighth Amendment.  We agree.

"[I]f a constitutional claim is covered by a specific constitutional provision, such as the . . . Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process'" Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 260 (3d Cir. 2010)

(quoting United States v. Lanier, 520 U.S. 259, 272 n.7 (1997)); see also Albright v. Oliver, 510 U.S. 266, 272 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)).

Applying this rule to the instant case, it is clear that plaintiff's claim under the Fourteenth Amendment cannot survive, since it is a duplicative claim made for alleged conduct that is covered by the Eighth Amendment.  In accordance with Betts and Albright, it is therefore recommended that defendants' motion for summary judgment should be granted with respect to plaintiff's Fourteenth Amendment claim against all defendants.

## V.   RECOMMENDATION

Accordingly, for the foregoing reasons, IT IS HEREBY RECOMMENDED THAT defendants' motion for summary judgment (Doc. 20.) be granted in part and denied in part as follows:

1.   Defendants' motion for summary judgment should be GRANTED with respect to plaintiff's claims against defendants Kephardt, Kevalchick, and Sackett.

2.     Defendants' motion for summary judgment should be GRANTED with

respect to plaintiff's claim that defendants violated the Fourteenth

Amendment.

3.     In all other respects, defendants' motion for summary judgment on

plaintiff's Eighth Amendment failure-to-protect claims should be

DENIED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings,
recommendations or report addressing a motion or matter described in
28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
disposition of a prisoner case or a habeas corpus petition within fourteen
(14) days after being served with a copy thereof. Such party shall file
with the clerk of court, and serve on the magistrate judge and all parties,
written objections which shall specifically identify the portions of the
proposed findings, recommendations or report to which objection is
made and the basis for such objections. The briefing requirements set
forth in Local Rule 72.2 shall apply. A judge shall make a de novo
determination of those portions of the report or specified proposed
findings or recommendations to which objection is made and may
accept, reject, or modify, in whole or in part, the findings or
recommendations made by the magistrate judge. The judge, however,
need conduct a new hearing only in his or her discretion or where
required by law, and may consider the record developed before the
magistrate judge, making his or her own determination on the basis of
that record. The judge may also receive further evidence, recall
witnesses or recommit the matter to the magistrate judge with
instructions.

Submitted this 27th day of June 2012.


*/s/ Martin C. Carlson*_____
Martin C. Carlson
United States Magistrate Judge